KELLY POGUE ET AL *v.* BANK OF LAKE VILLAGE

5-5473                                   464 S. W. 2d 49

Opinion delivered February 22, 1971
[Rehearing denied March 29, 1971.]

*William H. Drew,* for appellants.

*David S. Gillison, Jr.,* for appellee.

GEORGE ROSE SMITH, Justice. This is a foreclosure suit brought by the appellee bank to enforce certain notes and mortgages executed by Delta Lumber Company, a corporation, and indorsed in part by the four individual defendants, Mr. and Mrs. Kelly Pogue and Mr. and Mrs. Doyle McBride. Doyle McBride, who is the principal appellant, contended unsuccessfully in the trial court that he was not liable upon a $55,000 note

executed by Delta Lumber Company to the bank, because McBride's name had been indorsed upon the note by Kelly Pogue, as attorney in fact, under the authority of a contract that had actually been abandoned before Pogue purported to act as McBride's attorney in fact. The chancellor held that McBride was liable upon the note to the extent of $50,000. For reversal it is again contended that Pogue was not authorized to act as McBride's attorney in fact on the date of the note, September 29, 1969.

At the trial the controlling issue was primarily one of fact. Pogue was the manager of Delta Lumber Company, a corporation in which Pogue and McBride were the principal stockholders. Delta, which was engaged in the building business, was in seriously straitened financial circumstances on February 19, 1968. On that date Delta, the Pogues, the McBrides, and the bank entered into a contract, entitled Credit Agreement, which was the basis for Pogue's asserted authority to sign McBride's name some nineteen months later as an indorser of Delta's note for $55,000.

We need not quote the contract, which comprised three and a half typewritten pages. In the contract the bank was designated as the Lender and the other five parties were designated as the Borrowers. By the terms of the contract the bank agreed to make unsecured loans to the Borrowers in amounts up to $50,000 in the aggregate, the loans to be evidenced by the Borrowers' promissory notes. The bank also agreed to make secured loans to the Borrowers in amounts up to the bank's lawful lending limit, which was originally $55,000 and which was later increased to $75,000. In the contract each Borrower appointed each of the other Borrowers as attorney in fact "to sign and execute its, his, her or their names to any and all notes" and other evidences of indebtedness executed to the bank under the terms of the Credit Agreement.

During the ensuing nineteen months the bank made to Delta a number of loans, both secured and unsecured, in substantial amounts. Most of the loans were

secured by pledges of amounts that Delta, as a building contractor, was to receive under construction contracts with third persons. It was the intention and hope of all concerned that Delta, with the bank's financing, would be able to perform all its contracts and wind up its business, without loss, as soon as possible.

The $55,000 unsecured note was executed by Delta on September 29, 1969. McBride refused to indorse the note personally, and that refusal was made known to the bank either by McBride himself or by Pogue, who had discussed the matter with McBride. Despite McBride's refusal to indorse the note, Pogue executed it on behalf of Delta and also signed his own name as an indorser and the names of the other three Borrowers as their attorney in fact. At the trial Pogue explained that he had considered it necessary for the Borrowers to obtain the loan, for otherwise Delta would have had to cease doing business, with the result that the bonding companies would have obtained all the monies from third persons that Delta had already earned but had not yet received. Despite the loan, however, Delta's condition deteriorated to the point of insolvency.

In our opinion the weight of the evidence supports the chancellor's conclusion that the Credit Agreement was still a viable contract that had not been abandoned when the $55,000 note was executed. To begin with, the agreement required the bank, as Lender, to make secured and unsecured loans to the Borrowers. According to the bank's testimony, the bank would not have advanced any funds to Delta without the Credit Agreement, because Delta's financial condition was not strong enough to justify the bank in making such advances. Thus all the loans throughout the nineteen-month period were actually made by the bank in reliance upon the Credit Agreement.

Moreover, almost every material provision in the Credit Agreement was complied with by the parties. Delta, for example, was required by the contract to obtain the bank's approval before Delta submitted a bid for any construction contract involving more than $10,-

000. In the record there are nine letters, written between August, 1968, and April, 1969, in which Delta solicited the bank's approval of such proposed bids. The Credit Agreement required the Borrowers to submit annual financial statements to the bank. With a single exception that requirement was complied with by the Borrowers. The Agreement required the Borrowers to acquire and transfer to the bank a $50,000 insurance policy upon Kelly Pogue's life. That was done.

The appellants stress a provision in the Credit Agreement that required Delta's unsecured line of credit to be paid in full for at least two months of each successive calendar year. Delta was never able to satisfy that clause in the contract. That provision, however, was for the bank's benefit, and consequently the bank could waive compliance if it chose to do so. *Hodges* v. *Taft,* 194 Ark. 259, 106 S. W. 2d 605 (1937).

The appellants also stress McBride's refusal to indorse the $55,000 note when he was asked to do so. McBride, however, took no steps to terminate the authority of the other Borrowers to act as his attorney in fact. The contract provided that any party could cancel it upon ten days written notice to the others, but upon cancellation by the Borrowers all outstanding indebtedness would become immediately due and payable. McBride evidently preferred to continue to receive the benefits of the contract. It is a familiar rule that one cannot accept the beneficial provisions of an agreement and at the same time disclaim the binding force of another provision that proves to be burdensome. *William Mfg. Co.* v. *Strasberg,* 229 Ark. 321, 314 S. W. 2d 500 (1958).

Finally, MrBride contends that the $55,000 note exceeded the limit of $50,000 that the Credit Agreement placed upon unsecured loans to the Borrowers. The chancellor, however, fully protected McBride's rights in this respect by awarding the bank a personal judgment against McBride to the extent of $50,000 only. Hence McBride has sustained no substantive loss by reason of the note's having exceeded the limit fixed by the Credit Agreement for an unsecured loan.

Affirmed.